16-year-old youth accuses a 40-year-old man of forcibly sodomizing him at a California State Park. The physical evidence involved is equivocal. The case comes down to the jury's belief of one person rather than the other person. Trial counsel had one and only one strategy to defend Mr. Buirst, and that was to attack the credibility of the complaining witness, to attack the truthfulness of the complaining witness, and he failed in implementing that strategy. The district court so found, with respect to his misguided effort, which failed to yield the complaining witness's juvenile records. I'm going to argue, if I have time, that the district court erred in failing to find that he was also ineffective in not obtaining the employment records and other impeachment evidence that was available, but right now I want to focus on the prejudice prong of Strickland here. We have an unfortunately unreasonable application of the law to the facts of this case by the district court, and I'm using the district court opinion as a proxy for what the California court might have found if they had actually addressed the issue and made a written opinion, which they didn't. We have a one-sentence denial. And here's the area where the district court was unreasonable in characterizing the impeachment evidence and the impact that it could have had. On page 9 of the opinion, the district court accurately describes the evidence that would have been developed if counsel had pursued the juvenile records. And the district court actually ---- Kennedy. Counsel, before you proceed with that, it may well be in this record or in your briefs, but I missed it. Is there some provision under California law where juvenile records can be used for this purpose? That they can be used to impeach somebody? Brought into a different proceeding. Oh. And used for impeachment of a witness. Your Honor, I'm ---- the answer is that the juvenile record itself might not be admissible for impeachment, but where the juvenile record has an admission of the witness, it could be used as a prior inconsistent statement. That part would be a prior inconsistent statement. Your answer to me is that there's something in California law that permits an attorney to inspect a confidential record and use whatever is in that record. The answer to that question is unequivocally yes. Welfare and Institutions Code, Section 827, which we as habeas counsel activated to obtain these records, and which trial ---- and which the trial court suggested that trial counsel do, but trial counsel didn't do, is the procedural vehicle where you get these. And, of course, Davis v. Alaska indicates that confidentiality attaching to juvenile records yields to a defendant's right to impeaching evidence containing that. Thank you. I'll check that. And the district court did refer to that code section in finding that counsel was an effective assistant in not pursuing that. But the ---- with respect to the first major, I'm going to call it, impeaching bombshell that comes out of these records, is ---- are the statements of the complaining witness's mother that he was a chronic liar, that he gets caught in a lie and continues to deny his involvement in whatever the particular problem may be. And the complaining witness himself states to his probation officer that he, quote, has difficulty in acknowledging the truth once he gets got ---- once he's got caught in a lie. Now, a defense counsel could take this and ask the mother, what's your opinion of the character of your son for telling the truth in difficult situations? And she says whatever she's going to say on the ---- at the trial, but then we have the probation officer to impeach her and the probation report to impeach her. Now, that would be a fairly impressive piece of impeachment, because under California law, under common sense and every other standard, a person's character defect on the basic fundamental trait of untruthfulness is admissible to impeach your testimony on any point. The district court characterized that evidence accurately, but then when he turned to prejudices on page 10, concluded that ---- offered the concluding sentence that, well, quote, an adolescent lying to his mother is quite different than his fabricating an intricate story of sexual abuse for no apparent purpose. Well, that's not really a fair characterization of what was in the probation report. The probation report doesn't say that his mother said, well, he's lied to me a couple of times about this and that. The mother makes a statement about her son's character trait for lying. That's a much more significant piece of impeaching evidence than the district court's characterization of an adolescent lying to his mother about this and that. Next, the district court accurately recognized that the juvenile records showed specific instances of the complaining witness lying at the trial against Petitioner with respect to his ---- the times that it lapsed since his last run-in with the law and the number of run-ins in the law that he had. He ---- the probation reports are official documentary records showing that he was in deep trouble with the juvenile authorities one month before his complaint against Mr. Burst, and then six months after that, after his complaint and six months before his testimony at trial, he was again back in trouble, accused by his own mother of stealing from her and her new husband. And so when he lies to the jury that I had been clean for a year before this happened and I only had one run-in with the police in my life when they got me for some methamphetamine, but I'd been clean for a year, that's false. And it shows that he was falsely portraying himself, who had no reason to make up a false story. His life was going along just fine. The district court acknowledged the falsity of his trial testimony, but then discounted it, kind of trivialized it on page 10 of the opinion by ignoring the impeaching relevance of a complaining witness who lies about an objective fact at the trial. Those are the three areas where the district court's opinion was an unreasonable denigration, diminution of the actual reasonable impeaching impact of the evidence. But the most egregious example of this, and if I may just add this one, Your Honor, the district court concluded the lack of prejudice analysis with the comment that the strategy of attacking the truthfulness of a rape victim might prove risky and trial counsel, even armed with the information in the juvenile records, may have opted not to present this evidence. But that's just flagrantly in conflict with trial counsel's unrebutted declaration in the record. Excerpt of record number eight, which at page three he says, now that I've had a chance to review Michael Shibley's juvenile records, I believe that they contain devastating impeachment evidence, which I would have presented and argued vigorously had it been available to me at trial. So the argument against you, or the problem I'm having with the case, is not whether the counsel would have used that. I'm quite convinced he would have used that. The argument I'm having is basically Strickland prejudice. Even if he had used it, how strong is the evidence against your client? So we have a story that's, you know, at first Mr. Burst denies that he's ever had anything to do with this kid. But then, this is not on the stand, but in sort of the episode at Van Damme Park, but then, no, it turns out, well, he'd actually come and seen the parents at the fire and so on. So we have a client, and the jury hears this, we know that your client has already wrongly denied to the authorities that he'd had any contact with this kid. We have the kid crouching in the phone booth with a knife in his hand when the 911 people come. We have some physical evidence. I mean, there's some fairly damning evidence against your client. May I address that? Please, no, that's exactly what I want you to address. Just a minute. Okay. The youth is found crouching in the phone booth by conservative calculation two hours after the episode had to have concluded. So there's a two-hour time lag there between when the call is made and when, under the circumstances of the evening, whatever happened had to have been concluded. So there's a gap. They say there are two hours between what happened and the call? Yes. Okay. I'd be interested in hearing that from when you get up. Okay. With respect, as far as the statements of Mr. Burst, which were, which when he was awakened up in his camper by the authorities, were not the same as what he testified at trial. Okay. So that is a blot on his credibility. Yes, of course. At the same time, defense counsel counted up 20 inconsistencies between the complaining witness' trial testimony and the initial story that the complaining witness gave to the police. So that is a major blot on the complaining witness' credibility. Defense counsel had to find some objective evidence which would give the jury an idea of who was telling the truth. And the fact that one person is a characterological liar had lied to his employer, his grandparents, his mother, and admitted being a chronological liar would have made a tremendous difference to the jury. My final comment on the strength of the evidence is the physical evidence was, ranged from equivocal to exculpatory because there was some minor redness in the area of the anus, which the nurse said, I haven't really seen this before, and it came in a case of sexual assault. So it didn't fit into a typical category that she immediately recognized as being symptomatic. There was a miscellaneous result taken from the anal swab, which the Kay Belchner said it is uninterpretable because there's no seminal fluid to attach it to. And that shows the ultimate equivocalness of the physical evidence. And the final exculpatory aspect of this is the penile swab of the complaining witness shows saliva residue consistent not with burst but with Shibley himself. And so that result, what is that more consistent with? Is it more consistent with, if I may speak bluntly, is it more consistent with an adolescent involving in saliva-assisted masturbation, or is it more consistent with oral copulation by a third party? Well, the amylase saliva residue is consistent with the kid himself. That's the evidence. That's the physical evidence. And that certainly doesn't point to an unapologetic... And I don't like these physical details, but let me... And it is found on the penile shaft of whom? The complaining witness has saliva residue called amylase on his penis. On his own penis. On his own penis. And that's examined, and it's consistent with his own blood type, not with burst blood type. And so what's the inference from that? Oh, yeah. Okay. So, Your Honor, I would like to reserve a possible moment unless there's another question. You've run over, but I'd like to hear some rebuttal, depending on what the other side says. So, sure. We'll give you a minute or so. May it please the Court. Peggy Ruffray, Deputy Attorney General for Respondent. I would also like to focus on the prejudice aspect of the Strickland analysis here. We see it quite differently. This was not just one person's word against another at trial because there was also the forensic evidence and there was also the defendant's false statements. So regardless of whether trial counsel should have followed up on getting the juvenile records, and he probably should have, the employment records probably not. But even if he had gotten that, even if he had used that for additional impeachment, what the district court said was an adolescent lying to his mother is quite different than fabricating an intricate story of sexual abuse for no apparent purpose. And as Your Honor pointed out, when the victim called 911, the Rangers came out. They saw him crouching down in the phone booth, clutching a knife in a defensive position. These are quotes. They said he was distraught, crying, terrified, and shaking pretty badly. Can you address the timeline that I just heard about that your opponent says, by a conservative estimate, he made the phone call two hours after the last sort of encounter or episode? Is that right? Well, it's unclear. There is an unexplained time lag during the evening's events, but it's not exactly clear when the events occurred. So the phone call was, I believe, around 2.30 in the morning, but it's unclear whether the events occurred later versus earlier or not. It was unexplained. It was raised at trial. But it was just one of those unexplained mysteries, I guess. At the time, though, when the victim was found, it was, as I say, 2.30 in the morning. He then was taken to the hospital where he had to undergo an intrusive and embarrassing sexual assault examination by a female nurse. This is a 16-year-old boy. He endured all of that. That revealed that he had not just an inflammation on the outside of his rectum, but a fissure inside, a fresh tear that was red that the nurse said had been recently inflicted. And that wound inside the anus had the type of secretion that was consistent with the defendant's blood type. Now, how in the world was this 16-year-old boy going to get somebody else's blood type, if not for a sexual assault? That's the argument that even if there had been this additional impeachment, that's what the district attorney was going to be arguing. There was saliva on his penis and on his neck. It was unclear whether the blood type of the defendant was on the saliva on the penis. There was blood type from saliva from the defendant's blood type on the victim's neck, and he testified that the victim had kissed his neck. So that's also forensic evidence. Did the defendant admit that he had kissed the neck? No. He denied that also? No. He denied any physical contact with the boy whatsoever, which is another part of the prejudice analysis. When the defendant was first contacted, he said, yeah, I talked to him, but then I left the campsite. Here's the quote. I was at the campsite for a long time. Then I came back and went to sleep, and that's all. That's his first statement. Then the ranger goes. He talks further to the victim and says, well, here's what the guy says. And the boy said, well, my parents were there at the campsite with us. They saw us leave together. So the ranger goes back and talks to the defendant and says, well, what about this? And he says, oh, well, now that you mention it, we did leave together. We walked on the beach alone together, but nothing happened. And then by the time of trial, he tells a third story, which is we walked on the beach, then we came back and we each went into the bathroom, which is where the sodomy was alleged to have occurred. So when the jury hears this evolving sequence of statements, which the first one is demonstrably false, how are they going to evaluate that, even if, as I say, the victim has some additional impeachment about lying to his mother, which is qualitatively different from lying about this kind of an assault with forensic evidence that really can't otherwise be explained, plus the defendant lies to the rangers. I think if you put all that together, then this is a state habeas case. And so we have a silent denial, but presumably the state court looked at this. It's a well-established rule that if you can dispose of a Strickland claim on lack of prejudice, then you can do that easily. I think we can assume that that's what the state court did. So the question then, was that objectively unreasonable for them to find no prejudice here? And that's a very high standard, as the U.S. Supreme Court has told us again and again. It's our position that wasn't met here. Thank you. One minute. With respect to the comments made by the Attorney General, the evidence that the complaining witness endured an intrusive sexual examination is consistent with the scenario that could have been presented, that he needed to use this incident to turn himself from the black sheep of the family who was in increasing trouble into a victim where he would get sympathy, where his family would rally around him, just as they did. The first thing that his mother said when the ranger brought him over to them at 2.30 in the morning and woke him up was, what has he done now? That is the state of the family situation. And I'm quoting from the California Court of Appeal, Opinion Page 2. That is the state of the family relationship at the time that this occurred. Shibley was in trouble on every possible front, and this was a, from a 16-year-old boy's point of view, a potentially great way of turning the tide of his failing life's fortunes, so that the sexual examination trauma actually fits in with his self-victimization here, as does much of the other physical evidence. I'm going to ask the Court to take a step back for an overview of this. The jury got nothing to, got no evidence whatsoever to impugn his credibility. The prosecutor was able to argue to the jury, you don't have any reason for him to make this up. But there was a host of reasons for him to have made this up based on his failing life circumstances at that point. Thank you, Your Honor. Thank you very much. The case of Burst v. Gomez is now submitted for decision. We will take a ten-minute break. We've got two remaining cases on the calendar, United States v. Schiff and City Solutions v. Clear Channel Communications, but we'll take a ten-minute break at this time. All rise.
judges: Hug, Alarcon,w. Fletcher